UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JAMES LUCKIE,

Plaintiff,

– *against* –

THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY; PORT AUTHORITY INSPECTOR GENERAL; JOHN LEDDEN, *individually and as an employee of the Port Authority of New York and New Jersey Office of Inspector General*; MICHAEL NESTOR, *individually and as an employee of the Port Authority of New York and New Jersey Office of Inspector General*; STEVEN PASICHOW, *individually and as an employee of the Port Authority of New York and New Jersey Office of Inspector General*; PETER MAINO, *individually and as an employee of the Port Authority of New York and New Jersey Office of Inspector General; and* MARK GAUNT, *individually and as an employee of the Port Authority of New York and New Jersey Office of Inspector General*,

Defendants.

**OPINION & ORDER**

22-cv-6114 (ER)

RAMOS, D.J.:

James Luckie filed this suit against the Port Authority of New York and New Jersey (the "Port Authority"), the Port Authority Inspector General, and five employees of the Port Authority (collectively "Defendants"). Doc. 1. In 2019, Luckie was indicted in New York state court for bribery in connection with his work at the World Trade Center ("WTC"), a property owned by the Port Authority. Doc. 60 ¶¶ 26, 138. The indictment was ultimately dismissed for insufficient evidence. *Id.* ¶ 143; Doc. 67-16. Luckie then filed the instant action, alleging that Defendants caused his wrongful arrest and malicious

prosecution by the New York State Attorney General's Office. Doc. 1. Before the Court is Defendants' motion for summary judgment on all claims. Doc. 59. For the reasons set forth below, the motion is GRANTED.

## I. BACKGROUND

### A. Factual Background[1]

#### *1. The Parties*

The Port Authority is a bi-state governmental agency created by a compact between the states of New York and New Jersey. Doc. 60 ¶ 1. The Port Authority owned the WTC and hired private companies to manage it. *Id.* ¶ 26. On June 25, 2013, it entered into a 7-year site-wide management agreement with Cushman & Wakefield. *Id.* The next year, Cushman & Wakefield retained Hatzel & Buehler to provide electrical maintenance services at the WTC for three years. *Id.* ¶ 28.

The individual Defendants in this action are employees of the Port Authority: John Ledden is an investigator with the Inspector General's Office, *id.* ¶ 2; Steven Pasichow was the Director of Investigations with the Inspector General's Office, *id.* ¶ 4; Peter Maino was a supervisory police investigator, *id.* ¶ 7; and Mark Gaunt was a patrolman with the Port Authority police department, *id.* ¶ 9.

Before he was fired, Luckie worked as the electrical operations manager for Cushman & Wakefield at the WTC. *Id.* ¶ 18. He started to work at the WTC in 2012. *Id.* ¶ 11. At the time, he was employed by O'Hare Construction. *Id.* He transferred from O'Hare to Cushman & Wakefield in the summer of 2013. *Id.* ¶ 12. Although he was a Cushman & Wakefield employee, he had an office at the WTC and was given a Port

[1] The following facts are taken from the parties' Rule 56.1 statements and the materials submitted in connection with the motion. Although the Court is not required to consider facts outside of the parties' Rule 56.1 statements, it may do so in its own discretion. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001). Moreover, the Court treats as admitted the facts set forth in the Rule 56.1 statements "unless specifically denied and controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." Local Civil Rule 56.1; *Cequel Communications LLC v. Mox Networks, LLC*, No. 21-cv-5577 (NRB), 2024 WL 3924709, at *1 (S.D.N.Y. Aug. 23, 2024).

Authority cell phone, landline phone, laptop, and email address and access to the Port Authority's website. *Id.* ¶ 37.

*2. Luckie's Role in the Electrical Service Contract Being Rewarded to Hatzel & Buehler*

In January 2014, before Cushman & Wakefield issued any request for proposal ("RFP") for the three-year electrical services contract at the WTC, Luckie sent Paul Angerame, the vice president of Hatzel & Buehler, an email regarding a short-term project:

> Paul, I am going to send you a copy for your review. It['s] nothing huge but the intention is to get a foot in the door [. . . .] We will be putting out an RFP later this year for a larger period of time. Setting this up will [. . .] serve us two-fold[.] [I] could use [Hatzel & Buehler] for work that would come up and additional[ly] get you familiar with the campus [. . . .] Have a great day love you me [sic] brother[,] Jimmy.

*Id.* ¶ 56; Doc. 60-18. Luckie knew Angerame from when they worked together at Forest Electric, another electrical services provider. Doc. 60 ¶¶ 22–23. In fact, Luckie listed Angerame as a reference when he first applied for a position at Cushman & Wakefield. Doc. 68 ¶ 63; Doc. 61-5 at 147. Thereafter, Luckie included Hatzel & Buehler on the distribution list for the RFP for the three-year contract. Doc. 60 ¶ 57.

Luckie drafted the technical requirements for the RFP, served as a point of contact for bidders with questions, evaluated the bids, and along with other members of the review committee, recommended Hatzel & Buehler for the contract. *Id.* ¶¶ 58–59, 61; Doc. 68 ¶ 61. Not all of the members on the review committee had a background in electrical maintenance as Luckie did. Doc. 60 ¶ 63.

*3. Luckie's Role in Approving Work Outside the Three-year Contract*

In addition to maintenance under the three-year contract, Hatzel & Buehler also did other work for the WTC. Doc. 68 ¶ 67. The parties dispute whether Luckie authorized the additional work and what role, if any, Luckie played in awarding Hatzel &

Buehler the additional work. *Id.*; Doc. 65-1 ¶¶ 65–71. For example, the parties dispute whether Luckie awarded the Brookfield Feeder project to Hatzel & Buehler.[2] Luckie argues that James Kleeman, a Port Authority official in charge of the redevelopment of the WTC, directed Cushman & Wakefield to have Hatzel & Buehler work on the project. Doc. 65-1 ¶ 66. Defendants argue that Luckie "oversaw" the project and "was involved in the contract going to Hatzel & Buehler."[3] Doc. 68 ¶ 67.

John Ledden, the Port Authority investigator responsible for the investigation of Luckie, testified in his deposition that the Brookfield Feeder project was determined to be an "emergency" that did not go through a bidding process. Doc. 67-1 at 218:24–219:9. He believed that the project was in fact not an emergency and that Luckie framed it as an emergency to avoid the bidding process and award it to Hatzel & Buehler. *Id*. at 218:9–219:14, 224:1–225:3.

Ledden also believed that it was Luckie who decided that the Oculus safety chain project should be awarded to Hatzel & Buehler without any bidding process.[4] *Id*. at 175:21–25. However, according to Luckie, Kamran Khan, the head of WTC construction, emailed Luckie to have Hatzel & Buehler complete the project (the "Khan email"). Doc. 65 at 13; Doc. 65-3 at 2. Luckie claims that Ledden and the AG's office had access to the Khan email because Ledden had access to Luckie's electronic devices, which were seized during the investigation, and "Ledden [] indicated that he provided his

---

[2] The Brookfield Feeder project concerned an auxiliary electrical line that brought electricity into the WTC when the primary and secondary lines were disrupted. Doc. 67-1 at 217:10–17. This auxiliary line needed to be repaired because it was damaged after a flood. *Id*. at 218:5-23; Doc. 67-7 at 124:12–19.

[3] In support of their argument, Defendants cite to Robert Singleton's testimony before the grand jury and deposition in the instant action. Doc. 60 ¶ 66; Doc. 68 ¶ 67. Singleton was the general manager of the WTC for Cushman & Wakefield. Doc. 60 ¶ 19. He testified that Luckie "handles any additional services that [Hatzel & Buehler] may provide" and was responsible for "overseeing [Hatzel & Buehler] with respect to those projects." Doc. 67-10 at 48:13–50:1. He also testified that Kleeman decided that Hatzel & Buehler should be awarded the project but the decision "refers back to conversations" between Kleeman and Luckie. Doc. 67-7 at 123:18–124:4.

[4] The Oculus safety chain project involved installing safety chains on light fixture trims around the ring of the Oculus, the transportation hub at the WTC. Doc. 65-3.

entire file to the AG['] office." Doc. 65 at 13–14; Doc. 67-10 at 163:11–21, 166:12–17; Doc. 67-1 at 187:14–25; Doc. 60 ¶ 125. But Ledden testified that he did not have a recollection of the Khan email prior to his deposition, when Luckie's attorney presented him the email. Doc. 67-1 at 190:18–22.

*4. The Hiring of Unqualified Mechanics*

At the WTC, mechanics that provide basic electrical maintenance work are called Division of Building and Maintenance ("DBM") mechanics[5], as opposed to "A-journeymen," who install the electrical equipment. Doc. 67-5 at 30: 21–32:10. Pursuant to its contract with Cushman & Wakefield, Hatzel & Buehler was required to retain DBM mechanics for the WTC. Doc. 60 ¶ 75. After Luckie's termination, the DBM mechanics at the WTC were reviewed for their qualifications. *Id.* ¶ 81. Seven individuals were terminated for being unqualified. *Id.* Four of the fired DBM mechanics were identified as being related to Luckie or Hatzel & Buehler: James Sheehan was a friend of Luckie's son, *id.* ¶ 82; Anthony Fanesi was the son of Luckie's friend, *id.* ¶ 83; Justin Rodriguez was a friend of Luckie's friend, *id.* ¶ 84; and Mark Garrison was the brother of Michael Garrison, a project manager at Hatzel & Buehler and a past colleague of Luckie's, *id.* ¶¶ 24, 80.

The parties dispute Luckie's role in hiring the unqualified DBM mechanics. Luckie claims that he was not involved in every interview and that the ultimate responsibility to hire rested with Hatzel & Buehler. Doc. 65-1 ¶ 77. Defendants allege that Luckie participated in the interview and hiring process.[6] Doc. 68 ¶ 78. But there is

---

[5] In the Rule 56.1 statements, Defendants refer to workers who perform basic electrical maintenance work interchangeably as "DBM mechanics" and "DBM electricians." Docs. 60, 68. In this Opinion, the Court uses the term "DBM mechanics."

[6] In support of this allegation, Defendants cite to Luckie's deposition where he stated that he participated in the interview of the DBM mechanics. Doc. 67-5 at 34:13–21. But later during the deposition, Luckie clarified that he only participated in the first two or three interviews and the rest of the interviews were conducted by contractors and the union. *Id.* at 34:25–35:7.

no dispute that the seven unqualified individuals were approved by Luckie.[7] Doc. 60 ¶ 79.

*5. Investigation by the Inspector General's Office*

In 2016, the Port Authority Inspector General's Office received an email complaining that unqualified electricians were working at the WTC. *Id.* ¶ 40. This email was sent by Alan Heaney, a high-tension operator on site. *Id.* ¶ 41. Under the direction of the United States Attorney's Office for the Southern District of New York, Ledden opened an investigation. *Id.* ¶ 51. After that initial investigation, however, the U.S. Attorney's office declined to prosecute the case. *Id.* ¶¶ 51–53. The New York County District Attorney's office also declined to prosecute. *Id.* ¶ 54. But the New York State Attorney General's Office took over the investigation from the U.S. Attorney's office. *Id.* ¶ 55. Assistant Attorney General ("AAG") Gerard Murphy led the investigation. *Id.* ¶¶ 14, 125. They instructed Ledden to turn over all the relevant documents in his possession. *Id.* ¶ 125. Murphy also consulted with Ledden as to which witnesses he should interview. *Id.* ¶ 126.

*6. The Grand Jury Hearing*

After meeting with a number of witnesses, reviewing documents received from the U.S. Attorney's office and from Ledden, and verifying the authenticity of the evidence, AAG Murphy decided to present the case to a grand jury. *Id.* ¶¶ 126–30. He controlled which witnesses to call and decided what questions to ask the witnesses. *Id.* ¶ 134.

Ledden was called to testify before the grand jury. *Id.* ¶¶ 103–08. He testified about his interview with Luckie during the initial investigation. *Id.* ¶ 104. He also

---

[7] Luckie denies paragraph 77 of Defendants' Rule 56.1 statement, which states that "[o]nce Hatzel & Buehler took over the contract, they began supplying untrained electricians, who were approved by Luckie." Doc. 65-1 ¶ 77. But he does not deny paragraph 79—"[the hiring of the seven unqualified DBM mechanics] had been approved by Luckie." Doc. 65-1 ¶ 79.

testified that Michael Garrison, a project manager with Hatzel & Buehler, told him that Luckie had to approve anyone hired by Hatzel & Buehler to work at the WTC. *Id*. ¶ 105. Ledden also authenticated emails recovered from Luckie's Port Authority email account. *Id*. ¶ 108. But Luckie notes, and Defendants do not dispute, that Ledden did not testify before the grand jury about the Khan email, which directed Luckie to have Hatzel & Buehler complete the Oculus safety chain project. Doc. 65 at 14.

In addition, the grand jury heard testimony that between 2015 and 2017, Luckie received gifts from Hatzel & Buehler which totaled $17,138, consisting of tickets, meals, golf outings, and car services. Doc. 60 ¶ 118. They also heard that Cushman & Wakefield prohibited employees from accepting gifts with value greater than $50 and that Luckie was informed of this prohibition. *Id*. ¶ 30; Doc. 67-7 at 41:3–43:22. The Port Authority also has a "no gift" policy. Doc. 60 ¶ 114.

Michael Garrison testified that for business entertainment purpose, whenever the firm hosts a client for an event, a representative from Hatzel & Buehler typically attends the event with the client. *Id*. ¶ 112. Hatzel & Buehler gave Luckie a 10-game Knicks ticket package, but no one from the firm attended the games with Luckie. *Id*. ¶¶ 110–11.

On May 29, 2019, the grand jury returned an indictment charging Luckie with five counts: (1) corrupting the government in the first degree; (2) bribe receiving in the second degree; (3) commercial bribe receiving in the first degree; (4) receiving reward for official misconduct in the second degree; and (5) receiving reward for official misconduct in the second degree. *Id*. ¶ 138.

*7. Dismissal of the Indictment*

On November 5, 2020, Luckie moved to dismiss the indictment against him. *Id*. ¶ 142. On July 23, 2021, Justice Wiley of the New York County Supreme Court issued an order, dismissing the indictment based on insufficient evidence. *Id*. ¶ 143; Doc. 67-16 at 15. He found that: (1) Luckie was not a public servant; (2) there was insufficient evidence of an agreement among Luckie, Angerame, and Garrison; and (3) the Port

Authority and Cushman & Wakefield did not suffer economic harm. Doc. 67-16. The Attorney General's Office did not appeal this decision. Doc. 60 ¶ 147.

**B. Procedural History**

Luckie filed the instant action on July 18, 2022. Doc. 1. He alleges malicious prosecution pursuant to New York law (count one); intentional infliction of emotional distress (count two); abuse of process (count three); actual and constructive fraud (count four); conspiracy (count five); malicious prosecution pursuant to 42 U.S. Code § 1983, civil action for deprivation of rights (count six); selective prosecution pursuant to § 1983 (count seven); denial of due process (count eight); and negligent hiring, training, and supervision (count nine).[8] *Id*. at 16–27. The parties completed discovery on July 11, 2025. Doc. 51. Defendants moved for summary judgment on all claims on November 3, 2025. Doc. 59.

## II. LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free School District*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). A fact is "material" if it might affect the outcome of the litigation under the governing law. *Id.* The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Medical Center*, 706 F.

---

[8] In the complaint, both selective prosecution and denial of due process are mistakenly labeled as count seven, and negligent hiring is labeled as count ten without any claim being labeled as count nine. Doc. 1 at 16–27. The Court renumbers the causes of action for clarity.

Supp. 2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (citing *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'" *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture, or surmise. *Goenaga v. March of Dimes Birth Defects Found*, 51 F.3d 14, 18 (2d Cir. 1995). To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986)).

## III. DISCUSSION

### A. Malicious Prosecution

Defendants move to dismiss Luckie's malicious prosecution claims pursuant to New York and federal law. Pursuant to New York law, a malicious prosecution claim requires: (1) the initiation of a proceeding; (2) its termination favorable to plaintiff; (3) lack of probable cause; and (4) malice. *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003) (quoting *Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983)). The tort of malicious prosecution can also give rise to a federal § 1983 claim. *Manganiello v. City of New York*, 612 F.3d 149, 160–61 (2d Cir. 2010). To prevail on a federal § 1983 claim for malicious prosecution, a plaintiff must show all the elements of malicious prosecution pursuant to state law, as well as a violation of the plaintiff's right under the Fourth Amendment. *Id*.

The primary issue before the Court is whether there was probable cause supporting the criminal charges against Luckie. Doc. 62 at 13; Doc. 65 at 6. The Court determines that there is no genuine issue of fact with regard to the existence of probable

cause. An indictment by a grand jury creates a presumption of probable cause. *Rothstein v. Carriere*, 373 F.3d 275, 282–83 (2d Cir. 2004); *Colon,* 60 N.Y.2d at 82. This presumption can only be overcome when the plaintiff presents evidence establishing that the defendants "have not made a complete and full statement of facts either to the [g]rand [j]ury or to the [prosecutor], that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith." *Colon,* 60 N.Y.2d at 82–83; *Bermudez v. City of New York*, 790 F.3d 368, 377 (2d Cir. 2015). In determining a malicious prosecution claim, the court is not allowed to "weigh the evidence upon which the police acted or which was before the [g]rand [j]ury after the indictment has issued." *Bertuglia v. Schaffler*, 672 F. App'x 96, 100 (2d Cir. 2016) (summary order) (quoting *Colon,* 60 N.Y.2d at 83).

Here, there is a presumption of probable cause because Luckie was duly indicted by a grand jury. Doc. 60 ¶ 139. Luckie argues that the presumption does not exist in this case because the indictment was subsequently dismissed by Justice Wiley. Doc. 65 at 25. In support of his argument, Luckie cites *Cox v. County of Suffolk*, 827 F. Supp. 935 (E.D.N.Y. 1993). The plaintiff in *Cox* was indicted for sodomy. *Id*. at 937. That indictment was dismissed by a state court judge because the plaintiff was only an unwilling participant in the underlying conduct and there was "a total lack of evidence" supporting his *mens rea*. *Id*. at 939. The *Cox* court acknowledged that there was no evidence of misconduct by the police defendants, except that they continued prosecuting the plaintiff after receiving exculpatory evidence. *Id*. But it held that the presumption of probable cause "disappeared" when the indictment was dismissed by reason of a total lack of evidence. *Id*.

However, *Cox* is an outlier in this Circuit.[9] *See e.g.*, *Soto v. City of New York*, 132 F. Supp. 3d 424, 454–55 (E.D.N.Y. 2015); *Kanciper v. Lato*, No. 13-cv-0871(SJF) (SIL), 2016 WL 11507274, at *24 (E.D.N.Y. Dec. 1, 2016), *aff'd*, 718 F. App'x 24 (2d Cir. 2017). Most importantly, the New York Court of Appeals has clearly held that courts should not weigh the evidence presented to the grand jury and that the presumption of probable cause created by an indictment can only be overcome by evidence that the indictment was produced by "fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Colon,* 60 N.Y.2d at 83; *Van Buskirk v. The New York Times Co.*, 325 F.3d 87, 89 (2d Cir. 2003) ("the highest court of a state has the final word on the meaning of state law").

In any event, the instant case is distinguishable from *Cox* because Justice Wiley did not find "a total lack of evidence" supporting any element of the crime charged. Doc. 67-16. Justice Wiley dismissed "all counts of the indictment based on insufficient evidence." *Id*. at 15. Luckie argues that Justice Wiley determined that there was a complete lack of evidence supporting whether: (1) he was a public servant; (2) the Port Authority or Cushman & Wakefield suffered economic harm; and (3) there was an agreement among Luckie, Angerame, and Garrison. Doc. 65 at 7–10. However, there is no language in the decision indicating that Justice Wiley found that there was a total lack of evidence supporting these elements, instead of merely legally insufficient evidence. *Id*. In fact, Justice Wiley acknowledged evidence that the prosecution presented in support of these elements. *See e.g.*, Doc. 67-16 at 8, 10, 13, 15. Therefore, the presumption of probable cause still stands. *See Minott*, 2014 WL 1386583, at *17

[9] Luckie argues that *Minott v. Duffy*, No. 11-cv-1217 (KPF), 2014 WL 1386583 (S.D.N.Y. Apr. 8, 2014), supports the holding in *Cox*. Doc. 65 at 7. Indeed, *Minott* held that "the intuition underlying *Cox's* approach has merit." *Minott*, 2014 WL 1386583, at *17. But this is as far as *Minott* went. *Minott* avoided following *Cox* by distinguishing the facts of the cases. *Id*. It also held that the result in *Cox* is "surprising," given the clarity with which the New York Court of Appeals has held that the presumption of probable cause can only be overcome by evidence of bad faith. *Id*. at *16.

(distinguishing *Cox* and holding that the dismissal of an indictment based on insufficient, instead of a total lack of, evidence did not dissipate the presumption of probable cause); *see also Bertuglia*, 672 F. App'x at 100 ("the dismissals of the indictments due to legally insufficient evidence did not vitiate the presumption of probable cause created by the indictments").

Luckie further contends that the evidence presented in the criminal proceeding did not rise to a level of probable cause because Ledden "fabricated" and misinterpreted certain evidence. Doc. 65 at 11–21. Specifically, as discussed above, Ledden and the AG's office had access to the Khan email that directed Luckie to have Hatzel & Buehler complete the Oculus safety chains project. Doc. 65 at 13–14. Luckie argues that Ledden deliberately mislead the grand jury and fabricated evidence of guilt because he did not mention this email during his testimony. *Id*. at 14. In addition, Ledden claimed that he did not have a recollection of this email when Luckie's attorney presented it to him in his deposition. *Id*. Moreover, he argues that Ledden's interpretation of his role in the procurement process was speculative and Ledden disregarded evidence supporting an innocent interpretation of his conduct. *Id*. at 12, 17.

Because the Court determines that the presumption of probable cause was not vitiated by the dismissal of the indictment, it declines Luckie's invitation to weigh the evidence presented to the grand jury and evaluate whether Ledden fabricated or misinterpreted evidence. *See Colon,* 60 N.Y.2d at 83 (holding that in determining the existence of probable cause for a malicious prosecution claim, courts are not allowed to "weigh the evidence upon which the police acted or which was before the [g]rand [j]ury after the indictment has issued").

Luckie does not directly argue that the presumption of probable cause is rebutted because the indictment was produced by fraud, perjury, or any misconduct of Defendants. Doc. 65. But even if he did, he fails to establish that the indictment was procured by any misconduct. To the extent that he argues that Ledden withheld the Khan email from the

grand jury, this argument requires an unsupported leap: that Ledden had actually seen the email before his grand jury testimony, determined that it was exculpatory, and made a willful decision to suppress it. But Ledden testified in his deposition that he had no prior recollection of this email. Doc. 67-1 at 190:18–22. Moreover, even assuming, *arguendo*, that Ledden had seen the email, the presumption of probable cause would not be rebutted by his failure to volunteer information about it at the grand jury hearing. *See Burgess v. DeJoseph*, 725 F. App'x 36, 39–40 (2d Cir. 2018) (summary order) (holding that the presumption of probable cause was not rebutted by the police defendants' failure to testify to certain exculpatory evidence at the grand jury hearing); *Daly v. Ragona*, No. 11-cv-3836 (JFB) (WDW), 2013 WL 3428185, at *7 (E.D.N.Y. July 9, 2013) (similar). The prosecutor, not Ledden, "had the discretion and authority to decide what evidence to present to the grand jury" and was "under no duty to present every item of arguable exculpatory evidence in seeking an indictment." *Id*. Defendants' motion for summary judgment is granted as to the malicious prosecution claims.[10]

**B. The Remainder of the Claims**

Defendants also moved for summary judgment on Luckie's other claims: intentional infliction of emotional distress, abuse of process, actual and constructive fraud, conspiracy, selective prosecution, denial of due process, and negligent hiring, training, and supervision. Doc. 62 at 16–25. For each claim, they advance arguments as to why summary judgment should be granted in their favor. *Id*. However, Luckie fails to respond to any of these arguments. Luckie only mentions the other claims in the very last sentence of his memorandum by stating that he "requests that the motion for summary judgment be denied based upon the remaining counts in the complaint, as there is a plethora of evidence that raises triable issues of fact for a jury to consider." Doc. 65 at

---

[10] Defendants also argue that the malicious prosecution claims fail for lack of causation. Doc. 62 at 15–16. They argue that AAG Murphy made an independent decision to prosecute Luckie and thus broke the causal chain between any conduct of Defendants and the prosecution of Luckie. *Id*. There is no need for the Court to reach this issue because the Court determines that there was probable cause to prosecute Luckie.

26. But he does not identify any "triable issues of fact" regarding these claims. *Id*. Courts "may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." *Mayes v. City of Yonkers*, No. 21-cv-00823 (NSR), 2023 WL 8528641, at *3 (S.D.N.Y. Dec. 8, 2023). Considering that Luckie is represented by counsel, these claims are deemed abandoned and therefore dismissed, upon Defendants' request. Doc. 66 at 13; *see Capak v. Epps*, 662 F. Supp. 3d 463, 465 (S.D.N.Y. 2023)(holding that the claim should be deemed abandoned when the plaintiff only opposed to the dismissal of the claim in a conclusory manner without addressing the arguments in support of dismissal put forward by the defendant).

## IV. CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED. The Clerk of Cour is respectfully directed to terminate the motion, Doc. 59, and close the case.

It is SO ORDERED.

Dated: July 22, 2026
New York, New York

EDGARDO RAMOS, U.S.D.J.